USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUL 20 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CAMMEBY'S FUNDING III, LLC,

                  Plaintiff,

    -v-

CAPITALSOURCE FINANCE, LLC,

                  Defendant.
------------------------------------------------------------X

11 Civ. 3644 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

    Defendant moves to dismiss the present action pursuant to Rule 12(b)(1), contending that Plaintiff assigned the promissory notes necessary for it to have standing to commence the action and that this Court therefore lacks subject matter jurisdiction. Because the Court concludes that Plaintiff has demonstrated by a preponderance of the evidence that it never assigned the promissory notes necessary for it to have standing, Defendant's Motion is DENIED.

    I.    **STANDARD OF REVIEW**

    "In the absence of standing, a court lacks the requisite subject matter jurisdiction over the case." *HealthNow New York Inc. v. New York*, 448 Fed. Appx. 79 (2d Cir. 2011) (summary order); *see also Amidax Trading Grp. V. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) ("to survive [a] Rule 12(b)(1) motion to dismiss, [a plaintiff] must allege facts that affirmatively and plausibly suggest that it has standing to sue.").

    "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transportation System, Inc.*, 426 F.3d 635, 638 (2005). On a 12(b)(1) motion, a district "court may resolve disputed

1

jurisdictional fact issues by reference to evidence outside the pleadings." *Flores v. S. Peru Copper Corp*, 414 F.3d 233, 255 n.30 (2d Cir. 2003) (quoting *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998)). Before reaching a legal conclusion regarding the existence of subject matter jurisdiction, "the district court should resolve the disputed factual matters by means of findings of fact." *Filetech*, 157 F.3d at 932; *see also* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 ("the district court, not a jury, must weigh the merits of what is presented on a Rule 12(b)(1) motion to dismiss, including resolving any issues of fact, and decide the question of subject matter jurisdiction.").

## II.     BACKGROUND

This case involves a series of transactions and related agreements to provide funding for a nursing home operator, SavaSeniorCare LLC ("Sava"). In 2004, Plaintiff, Cammeby's Funding III LLC ("Cam III"), an entity controlled by Rubin Schron, loaned $100 million to SVCare, the sole owner of Sava. (Dyer Decl. ¶ 3–4). Cam III borrowed the $100 million that it loaned to Sava from its affiliate, SMV Property Holdings LLC ("SMV"). (Dyer Decl. ¶ 5). In exchange for its loan to Sava, Cam III received a promissory note ("SV Note"). (CapSource Ex. A). Also in 2004, Defendant CapitalSource Finance LLC ("CapSource") entered into a revolving finance credit facility with Sava and an intercreditor agreement with Cam III. (CapSource Br. at 3, 5). In the present lawsuit, Cam III alleges that CapSource breached the terms of the 2009 intercreditor agreement by allowing SVCare to make equity distributions that reduce the likelihood that the SV Note will be repaid. (Compl. ¶ 23–30).

In 2006, in exchange for another promissory note, Cam III loaned an additional $20 million to SVCare. (Dyer Decl. ¶ 5). Cam III obtained these additional funds from another affiliate, CamFive Holdings LLC ("CamFive"). (*Id.*). Also in 2006, SMV assigned the $100 million debt it was owed by Cam III to CamFive. (*Id.*). As part of this inter-company refinancing, a new security agreement was executed between Cam III and CamFive on June 6, 2006 ("Security Agreement"), pursuant to which Cam III pledged the SV Notes to CamFive as security collateral for the $120 million in loans. (*Id.*; Dyer Decl. Ex. D).

The Security Agreement provides that CamFive may foreclose upon the security collateral (i.e. the SV Notes) in the event of a default. (Dyer Ex. D § 9). Pursuant to the Security Agreement, Cam III drafted two identical allonges, each indorsed in blank, which allow CamFive to take ownership of the SV Notes in the event of a default. (CapSource Ex. B; Dyer Decl. ¶ 6). Defendant does not allege that there was ever an event of default.

In the present motion, Defendant argues that a series of bookkeeping errors in 2009 caused an assignment of the SV Notes from Cam III to CamFive, in which case Cam III—no longer the holder of the notes of the loan allegedly affected by Defendant's breach—would have suffered no injury in fact and therefore would lack standing to pursue the present action. The Court is not persuaded.

### III. DISCUSSION

#### A. Benjamin Dyer's 2009 Actions and Subsequent Reliance on Them

The dispute at issue turns on the import ascribed to actions taken in 2009 by Benjamin Dyer ("Dyer"), the controller of both Cam entities. As described in his own

words, in 2009 Dyer "ran across an Allonge" that he believed indicated a previous 2006 assignment of the SV Notes from Cam III to CamFive. (CapSource Ex. F). Dyer has submitted a sworn declaration stating that his belief in 2006 that the Notes had been assigned to CamFive was a mistake based on his lack of knowledge of the Security Agreement and resulting conclusion that the allonges were stand-alone documents. (Dyer Decl. ¶ 13). Defendant does not contest the veracity of Dyer's declaration (7/5/12 Tr. at 42), and the Court credits it for purposes of this motion.

The question then becomes: did Dyer's subsequent actions merely alter internal bookkeeping and related records to erroneously reflect an assignment that never occurred, or did his actions, however contrary to the original intent of the collateral pledge, have the effect of causing an assignment that was not supposed to be? An examination of the evidence presented by the parties points to the conclusion that while Dyer made mistakes in bookkeeping—and representations were made in a related lawsuit in reliance on those errors—the errors did not in and of themselves effectuate a foreclosure on the SV Notes by CamFive or any other form of assignment. The Notes always remained security collateral pledged to secure CamFive's loan to Cam III.

In reaching this conclusion, the Court, as discussed below, considers (1) Dyer's actions in 2009, (2) Cam III's 2009 and 2010 tax returns, and (3) Plaintiff's allegations in a verified complaint and deposition testimony provided in a related state court action.

1. Dyer's Actions in 2009

Dyer states in his sworn declaration that when he "came across" an allonge in 2009, he "mistakenly concluded that the allonge was a stand-alone document that assigned the SVCARE Notes to CamFive." (Dyer Decl. ¶ 13). On May 21, 2009, Dyer

4

emailed Schron and Vincent Barra, who prepares the Cam entities' tax returns, informing them that:

> I ran across an Allonge to the $100,000,000 promissory note payable by SV Care Holdings LLC to Cammeby's Funding III LLC in which Cammeby's Funding III assigned its interest in the note to CAMFIVE Holdings LLC. Although it is not dated, it was effective 6/9/06.

(CapSource Ex. F).

Under the mistaken impression that a transfer had occurred in 2006, Dyer then adjusted the Cam entities' internal bookkeeping to reflect his misapprehension of what had occurred. (CapSource Ex. D). Specifically, he adjusted Cam III's books to remove a $100 million note as a receivable from SVCare and to remove $23 million in "Interest Income Receivable." (*Id.*). Correspondingly, on the books of CamFive, Dyer added an entry for a $100 million note receivable from SVCare, and he added $23 million in "Interest Income Receivable." (*Id.*). These internal bookkeeping adjustments reflect a mistaken understanding that a transfer of the Notes had occurred three years earlier in 2006, a transaction that would have allowed CamFive to accrue the interest receivable on the $100,000,000 Note instead of Cam III.

2. Tax Returns

Apparently in reliance on Dyer's May 21, 2009 email, Vincent Barra prepared Cam III's 2009 and 2010 taxes to reflect an assignment of the SV Notes to CamFive. (CapSource Ex. E). Subsequent to the discovery of Dyer's mistake during the course of this litigation, Cam III's 2009 and 2010 tax returns have been amended to reflect the Note as an asset belonging to Cam III and merely pledged to CamFive as security collateral. (Kleinhendler Decl. Ex. A).

### 3. Representations in the State Court Litigation

In 2010, Schron and his entities commenced a lawsuit in the Supreme Court of New York, County of New York against SVCare, its affiliates, and its managers. In a verified complaint dated August 5, 2010, Schron and his entities alleged that "[o]n or about June 6, 2009, Cam III assigned the SVCare Loan receivable to CamFive." (Reply Ex. 1).[1]

During the course of the state court litigation, Schron provided deposition testimony in which he stated that "the $20 million bounced around between Cam III and CamFive until it got corrected on the books." (CapSource Ex. G). Similarly, on October 10, 2011, Dyer gave deposition testimony in which he stated, "There came a point where I realized that there was [an allonge] where there was a hundred million dollar note that should have been in the books of Camfive Funding, and we moved it to the books of Camfive Holdings in I believe it was 2009." (*Id.*).

### B. A Preponderance of the Evidence Indicates that the Cam III Notes Were Never Assigned to CamFive

Defendant primarily contends that Dyer's incorrect internal bookkeeping in 2009 caused an assignment of the SV Notes, even if unintentionally or mistakenly (7/5/12 Tr. at 9). However, the Court concludes that Dyer's actions were not intended to, and in fact did not, cause an assignment of the Notes.

Dyer made a mistake in 2009, believing that the SV Notes had been assigned three years earlier. (Dyer Decl. ¶ 13). As a result, he made adjustments to internal record

---

[1] At oral argument, counsel for Plaintiff could not state whether this verified complaint has been amended, as Schron and his entities are being represented by different counsel in the state court case.

keeping to reflect what he thought was the correct financial state of the respective entities. (*Id.*).

Defendant, not contesting the truthfulness of Dyer's explanation, argues that what Dyer did in 2009 nonetheless effected an assignment of the Notes from Cam III to CamFive. (7/5/12 Tr. at 42). Yet the evidence does not indicate that Dyer, believing a transfer should have occurred, went ahead and executed the transfer. Instead, the evidence suggests that Dyer mistakenly believed that a transaction *had* occurred and erroneously made account adjustments in his bookkeeping. Thus, Dyer updated his internal balance sheets to indicate that the Notes had been on CamFive's books beginning in 2006. (CapSource Ex. D). In fact, the Notes were never foreclosed on by CamFive and always remained the property of Cam III. Dyer's erroneous bookkeeping entries did not effectuate the foreclosure by CamFive on $120 million in assets belonging to Cam III.

Defendant argues that no foreclosure needed to occur because CamFive forgave Cam III the money that it was owed upon receipt of the Notes, constituting a transaction for value separate from the original Security Agreement. (7/5/12 Tr. at 38–39). This argument reads too much into Dyer's erroneous record keeping. Dyer testifies in his declaration that his internal accounting documents were changed to wrongly indicate an assignment that had not in fact occurred. (Dyer Decl. ¶ 13). In effect, Defendant argues that the temporary alteration of the Cam entities' internal accounting documents for an approximately two-and-one-half-year period from 2009 through early 2012 retroactively effected an assignment that no one intended to occur, even though these accounting records were apparently accurate vis-à-vis the SV Notes prior to Dyer's 2009 "discovery"

7

and have been corrected to be accurate again today. Defendant's argument ascribes too much consequence to Dyer's record keeping errors.

In short, Dyer's account adjustments were mistakes because the Notes were only pledged as collateral to CamFive pursuant to a Security Agreement that only allowed for transfer of the Notes to CamFive in the event of a default, which neither party alleges occurred. A preponderance of the evidence indicates that the Cam III Notes were never assigned to CamFive. Cam III therefore has standing to pursue the present action against Capital Source.[2]

### IV. TAX RETURNS MAY BE FILED UNDER SEAL

The parties' application to file the Cam entities' tax returns under seal is granted. In determining whether it is appropriate to file documents under seal, courts must balance the presumption of access to documents against "competing considerations," including consideration of "the privacy interests of those resisting disclosure." *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 120 (2d Cir. 2006). "[F]inancial information, including bank account information, depending upon the context, may be filed under seal." *Broadhurst Inv., LP v. Bank of N.Y. Mellon*, No. 09-CV-1154-PKC, 2010 WL 3154840, at *6 (S.D.N.Y. Aug. 2, 2010) (Castel, J.). The Court therefore grants the parties' application to file under seal Exhibit E to CapitalSource's Memorandum of Law in Support of its Motion to Dismiss, Exhibit A to the Kleinhendler Declaration, and Exhibit F to the Dyer Declaration. All of these exhibits consist exclusively of closely owned entities' tax returns.

---

[2] The verified complaint in the state court case and Schron and Dyer's deposition are all consistent with Dyer's explanation that he made a mistake, which the Court credits. Subsequent reliance by others on Dyer's mistake in their spoken representations did nothing to alter the underlying reality that there was never an assignment of the SV Notes.

The parties shall file all of their other briefs and exhibits related to the instant motion on ECF forthwith without any redactions.

V.   CONCLUSION

Because Plaintiff has met its burden of demonstrating by a preponderance of the evidence that it had standing to commence the present action and that this Court therefore has subject matter jurisdiction, Defendant's motion is DENIED.

The parties shall resume the exchange of discovery. All fact discovery shall be completed on or before September 21, 2012. A conference shall be held on September 14, 2012, at 11:30 AM in Courtroom 17B.

SO ORDERED.

Dated: July 20, 2012
New York, New York

_____
ALISON J. NATHAN
United States District Judge